**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

MIRRIAM PIERRE,

                Plaintiff,

      v.

OTSUKA PHARMACEUTICAL
DEVELOPMENT &
COMMERCIALIZATION, INC.,

                Defendant.

Civil Action No. 23-21848 (MAS) (JTQ)

**MEMORANDUM OPINION**

---

**SHIPP, District Judge**

    This matter comes before the Court on Defendant Otsuka Pharmaceutical Development & Commercialization Inc.'s ("Otsuka" or "Defendant") Motion to Dismiss Plaintiff Mirriam Pierre's ("Plaintiff") Second Amended Complaint ("SAC")[1] under Federal Rule of Civil Procedure[2] 12(b)(6). (ECF No. 34.) Plaintiff opposed (ECF No. 36), and Defendant replied (ECF No. 37). The Court has carefully considered the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1(b). For the reasons below, Defendant's Motion to Dismiss is granted.

---

[1] Plaintiff amends the named Defendant in the SAC to "Otsuka America Pharmaceuticals" but keeps the case caption as "Otsuka Pharmaceutical Development & Commercialization, Inc." on both the SAC and Opposition Brief. In its Moving Brief, Otsuka likewise refers to itself as "Otsuka Pharmaceutical Development & Commercialization, Inc." Neither party has moved to amend the caption to date.

[2] Unless otherwise noted, all references to "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

## I. BACKGROUND

### A. Factual Background[3]

Plaintiff was employed with Otsuka as a Senior Director and Head of Data Management from December 2020 until January 2023. (SAC ¶¶ 6-7, ECF No. 30.) Otsuka is a pharmaceutical company that develops health products and pharmaceutical drugs to treat various diseases and health conditions. (*Id.* ¶¶ 52-53.)

While employed with Otsuka, Plaintiff was assigned to a department responsible for handling data of pre-market drugs to ensure the integrity of Otsuka's database in preparation for clinical trials. (*Id.* ¶¶ 54-56.) In other words, Plaintiff's employment at Otsuka involved clinical data from clinical investigations of products called Investigational New Drug Applications ("INDs"). (*Id.* ¶¶ 20, 22.) Clinical trials are generally divided into three phases. (*Id.* ¶¶ 24-28.) Plaintiff's department was responsible for Phases 2 and 3 of clinical trials. (*Id.* ¶ 27.) INDs in Phases 2 and 3 focus on "the assessment of the scientific quality of the clinical investigations and the likelihood that the investigations will yield data capable of meeting statutory standards for marketing approval." (*Id.* ¶ 26.)

Plaintiff's group "collected, cleaned[,] and locked data" for all of Otsuka's clinical trials from December 2020 to January 2023. (*Id.* ¶ 54.) At the start of Plaintiff's employment, her group was comprised of fifteen members and tasked with handling fourteen clinical trials. (*Id.* ¶ 61.) By January 2023, Plaintiff was responsible for thirty-seven clinical trials, but her group dwindled to nine members. (*Id.* ¶ 62.) This reduction in headcount is alleged to have "affected the quality of data being collected, cleaned[,] and locked." (*Id.* ¶ 63.)

---

[3] The Court, as it must, accepts as true all of Plaintiff's well-pleaded factual allegations and "construe[s] the [amended] complaint in the light most favorable to [P]laintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted).

Beginning in the summer of 2022, Plaintiff made monthly presentations to Otsuka's Research and Development Leadership Team (the "RDLT") to address certain issues that were affecting the group. (*See id.* ¶¶ 9-15.) These issues included, among other things: (1) "Otsuka's decision to refuse approval for [an] adequate headcount" which compromised "[Plaintiff's] department's ability to ensure data integrity" (*id.* ¶ 10); (2) "Otsuka's database lock period was unreasonably short and objectively shorter than industry standard" (*id.* ¶ 11); (3) Otsuka's "site lock process" jeopardized "patient safety and data integrity" (*id.* ¶ 12); and (4) Otsuka's failure to disclose adverse events risked presenting misleading data to regulatory authorities such as the Food and Drug Administration ("FDA") (*id.* ¶¶ 13-15).

Plaintiff states that, as these issues surfaced, members of the RDLT became "increasingly upset" and Plaintiff was "aggressively questioned" on the information she was presenting during the RDLT meetings. (*Id.* ¶¶ 123-24.) Plaintiff alleges that she was told by two individuals outside of the RDLT "not to continue to raise these issues." (*Id.* ¶ 125.) Based on Plaintiff's ongoing concerns regarding the "implications on patient health and safety that could arise from improperly cleaned and locked data[,]" Plaintiff "continued to raise these concerns" with the RDLT—all of which went unanswered. (*Id.* ¶¶ 132, 134-35.) According to Plaintiff, this caused Otsuka's leadership team to become "increasingly hostile and aggressive towards [Plaintiff] with the hopes that they could push her to quit her job." (*Id.* ¶ 136.)

Specifically, Plaintiff alleges that two members of the leadership team, Carol Augustine ("Augustine") and Debbie Profit ("Profit") retaliated against Plaintiff by engaging in conduct that included, but was not limited to: stating that Plaintiff was "not capable of performing the role of [Senior] Director" (*id.* ¶ 158), isolating Plaintiff from her peers by stating she was a "'bad' employee" (*id.* ¶ 159), making disparaging comments about Plaintiff, and "repeatedly

3

humiliat[ing] Plaintiff in meetings by minimizing the evidence [Plaintiff] provided on the data issues found" (*id.* ¶ 160). Because Plaintiff's group remained "understaffed" and in light of ongoing concerns over the "risky professional position that Otsuka had put her in," Plaintiff states that she had no option but to resign from her position with Otsuka in January 2023. (*Id.* ¶ 137.)

### B.   Procedural History

Several months after Plaintiff's resignation, in October 2023, this action was filed in the Superior Court of New Jersey, Somerset County, alleging a single claim against Defendant under the Conscientious Employee Protection Act ("CEPA"). (*See* State Court Complaint, annexed to Notice of Removal, Ex. A, ECF No. 1-1.) Defendant timely removed this action in November 2023.[4] (*See* Notice of Removal, ECF No. 1.) On April 19, 2024, this Court dismissed Plaintiff's First Amended Complaint ("FAC") without prejudice after Defendant initially moved to dismiss. (ECF No. 29.) Plaintiff timely filed a SAC on April 24, 2024. (ECF No. 30.) Defendant again moved to dismiss (ECF No. 34), Plaintiff opposed (ECF No. 36), and Defendant replied (ECF No. 37).

## II.   LEGAL STANDARD

Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court

---

[4] Plaintiff's First Amended Complaint followed the Notice of Removal and was filed on December 15, 2023. (*See* FAC, ECF No. 17.)

4

must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff[.]" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). "Although we must accept the allegations in the complaint as true, we are not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc) (internal quotations omitted); *Iqbal*, 556 U.S. at 678 (holding that courts may ignore bare statements that "the-defendant-unlawfully-harmed-me" (citing *Twombly*, 550 U.S. at 555)). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Fowler*, 578 F.3d at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

### III.  DISCUSSION

Plaintiff, in her SAC, alleges a single claim against Defendant for retaliation in violation of CEPA, N.J. Stat. Ann. § 34:19-1 to -14. (*See* SAC ¶¶ 146-78.) In a written Memorandum Opinion, this Court dismissed Plaintiff's FAC ("April 2024 Opinion") because Plaintiff failed to identify a statute, regulation, rule, or public policy related to the alleged conduct about which Plaintiff complained of that objectively could form a reasonable basis for an alleged violation of such law or public policy. (*See generally* Apr. 2024 Op., ECF No. 28.)

In moving to dismiss under Rule 12(b)(6), Defendant contends that Plaintiff's SAC suffers from the same deficiencies as the FAC, which this Court dismissed. (*See* Def.'s Moving Br., ECF

5

No. 34.) More specifically, Defendant moves to dismiss Plaintiff's SAC on the same grounds as the FAC, asserting that Plaintiff's SAC does not adequately plead a CEPA claim because Plaintiff: (1) fails to identify a law, rule, regulation or clear mandate of public policy that she reasonably believed Defendant violated; (2) fails to plausibly plead any cognizable adverse employment action under CEPA; and (3) fails to plausibly plead a causal connection between whistle-blowing activity and any alleged legally sufficient adverse employment action. (*See generally id.*) In response, Plaintiff argues generally that her SAC plausibly alleges facts establishing her CEPA claim. (*See generally* Pl.'s Opp'n Br., ECF No. 36.) In short, as with Plaintiff's FAC, Plaintiff argues that her SAC sufficiently pleads facts that she was engaged in a CEPA-protected whistleblowing activity, that she suffered a covered negative employment action, and that the two are causally linked. (*See id.* at 5-11.)

It is well settled under the CEPA that an employer may not take retaliatory action against an employee who "objects to, or refuses to participate in any activity, policy[,] or practice, which the employee reasonably believes . . . is incompatible with a clear mandate of public policy concerning public health, safety or welfare[.]" N.J. Stat. Ann. § 34:19-3(c). Carrying out this statutory mandate, the New Jersey Supreme Court has prescribed that, to state a claim under CEPA, a plaintiff must adequately allege that:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity . . . ; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

*Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003) (citing *Kolb v. Burns*, 727 A.2d 525, 530 (N.J. Super. Ct. App. Div. 1999)).

With respect to the first element, a plaintiff must "identify a statute, regulation, rule, or public policy that closely relates to the complained-of conduct." *Id.* at 901. The New Jersey Supreme Court and the lower state courts agree that when a plaintiff fails to provide such law or public policy, the trial court should enter judgment in favor of the defendant. *Safonof v. DirectSat USA*, No. 19-7523, 2020 WL 7074255, at *3 (D.N.J. Dec. 3, 2020) (citing *Dzwonar*, 828 A.2d at 901). "[T]his is an issue of law for the court—[a plaintiff must show] . . . an identifiable 'law, or a rule or regulation promulgated pursuant to law,' N.J. Stat. Ann. § 34:19-3c(1), or else 'a clear mandate of public policy concerning the public health, safety or welfare,' N.J. Stat. Ann. § 34:19-3c(3)." *Southward v. Elizabeth Bd. of Educ.*, No. 15-3699, 2017 WL 111924, at *5 (D.N.J. Jan. 11, 2017) (citations omitted). A court can, on its own, identify the law or policy that might have been implicated by the challenged conduct so long as the plaintiff alleges sufficient details. *Accord Scioscia v. Walmart Corp.*, No. 23-1940, 2023 WL 8237407, at *2 (D.N.J. Nov. 28, 2023) (stating that a complaint must "provide sufficient factual allegations for the Court to make such a determination on its own"); *see Griffin v. Metromedia Energy Inc.*, No. 10-3739, 2011 WL 12872504, at *3 (D.N.J. Feb. 7, 2011) (construing fraudulent billing as allowing the Court to "easily identify laws and public policies that might have been violated").

A plaintiff need not allege an actual legal violation but only a *reasonable belief* that the challenged employer conduct constituted a violation. *See Arterbridge v. Wayfair, LLC*, No. 21-13306, 2022 WL 577956, at *3 (D.N.J. Feb. 25, 2022) (quoting *Estate of Roach v. TRW, Inc.*, 754 A.2d 544, 552 (N.J. 2000)). At minimum, a plaintiff is required to identify the law or public policy that she believes was violated. *See Mayorga v. Sonoco Prods. Co.*, No. 12-5067, 2013 WL 1792554, at *2 (D.N.J. Apr. 26, 2013) (dismissing plaintiff's complaint for failure to allege anything that would be a violation of law); *Gaglione v. New Cmty. Corp.*, No. 06-1015, 2007 WL

2141429, at *2-3 (N.J. Super. Ct. App. Div. Jul. 27, 2007) (stating that a plaintiff's failure to identify any sort of violated statute or regulation, and later claiming on appeal that the defendant may have violated federal tax laws, was not enough to satisfy the first element of a CEPA claim). Indeed, the purportedly unlawful behavior must be more than just a private dispute between the employer and employee. *Mehlman v. Mobil Oil Corp.*, 707 A.2d 1000, 1013 (N.J. 1998); *see also Hitesman v. Bridgeway, Inc.*, 93 A.3d 306, 320 (N.J. 2014) (noting that, under *Dzwonar*'s analytical framework, where no such law or policy is forthcoming, a trial court can and should enter judgment in favor of a defendant).

In its April 2024 Opinion, the Court dismissed Plaintiff's FAC for failure to allege a violation of law or public policy. (*See* Apr. 2024 Op. 16.) The Court further explained that, in making such amendments, "Plaintiff should include specific provisions and explanations of the potentially violated statutes, regulations, or public policies . . . [and] describe Otsuka's conduct and allege the ways in which it is substantially related to each listed statute." (*Id.*) In response to the Court's April 2024 Opinion, Plaintiff filed the SAC, which provides a laundry list of regulations that she believes were potentially violated. (*See generally* SAC.) In addition, Plaintiff cites to the International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use ("ICH Guidelines") as a source of authority. (*Id.* ¶¶ 31-32.)

Here, the Court finds that Plaintiff's SAC contains the same flaws as her FAC, as she does not point to a specific statute, rule, or regulation governing the complained-of conduct. At the outset, the Court notes that the ICH Guidelines are exactly that—guidelines—and do not constitute

a binding rule or regulatory requirement.[5] In 2010, the FDA published the ICH Guidelines in the Federal Register, *see* 2010 Notice, 75 Fed. Reg. 3471 (Jan. 21, 2020), in accordance with 21 C.F.R. § 312.23(a)(8), which notes that "[g]uidance documents are available from FDA that describe ways in which [technical requirements for investigational studies] *may* be met." (emphasis added). The Federal Register notice states that the:

> guidance represents the agency's current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. An alternative approach may be used if such approach satisfies the requirements of the applicable statutes and regulations.

75 Fed. Reg. at 3472. As such, Plaintiff's allegations that she believed Otsuka violated those technical guidelines fall flat, as they merely serve to provide guidance and do not carry binding effect. *See Vanda Pharms., Inc. v. Food & Drug Admin.*, 436 F. Supp. 3d 256, 271 (D.D.C. 2020) (finding that the ICH Guidelines constitute a non-binding general policy statement).

As it pertains to the regulations Plaintiff provides, the Court again finds that Plaintiff has failed to point to "a statute, regulation, rule, or public policy that closely relates to the complained-of conduct" to sustain a claim under the CEPA. *Dzwonar*, 828 A.2d at 901. To start, Plaintiff alleges that the data locking protocol would fail to capture "adverse events" that may have "serious consequences in presenting misleading data to [a] regulatory authority such as the FDA." (SAC ¶ 14.) Specifically, Plaintiff points to 21 C.F.R. § 312.22, which,

> provides that the FDA review of a[n] . . . IND is to ensure safety and rights of the subjects on whom the drug is being tested and more importantly, "to help assure that the quality of the scientific

---

[5] "Sources of public policy include the United States and New Jersey Constitutions; federal and state laws and administrative rules, regulations and decisions; the common law and specific judicial decisions; and in certain cases, professional codes of ethics." *MacDougall v. Weichert*, 677 A.2d 162, 167 (N.J. 1996) (citing *Hennessey v. Coastal Eagle Point Oil Co.*, 609 A.2d 11, 16-17 (1992)).

9

evaluation of drugs is adequate to permit an evaluation of the drug's effectiveness and safety."

(SAC ¶ 25.) With respect to adverse events, Plaintiff points to 21 C.F.R. § 312.32(c)(1), which requires the reporting of any serious and unexpected adverse events through an IND safety report to the FDA and participating investigators. (SAC ¶ 30.) Such reports must be submitted as soon as possible but no later than fifteen calendar days after the sponsor, here Otsuka, determines that the information is reportable. 21 C.F.R. § 312.32(c)(1). Plaintiff's SAC, however, is devoid of any allegations that adverse events were not being reported after being identified as reportable. *See* 21 C.F.R. § 312.32(d)(3) (allowing a sponsor to submit a report of a suspected adverse reaction if the results of the sponsor's investigation show that an event not originally found to be reportable subsequently is deemed reportable). At most, Plaintiff seemingly complains about the procedures Otsuka has in place, which is insufficient to sustain a CEPA claim. *See Hitesman*, 63 A.3d at 235 ("CEPA affords no protection for the employee who simply disagrees with lawful policies, procedures or priorities of the employer.").

Second, as to Plaintiff's allegations that Otsuka's database lock period was unreasonably short and objectively shorter than industry standards, this allegation again is vague and simply does not identify a statute, regulation, rule, or public policy that Otsuka allegedly violated. (SAC ¶ 11.) Third, Plaintiff's allegations that Otsuka's eSource database systems "were not up to "industry standards" (*id.* ¶ 119) again are equally vague and disconnected from any identifiable statute, regulation, rule, or policy. In Plaintiff's SAC, Plaintiff alleges that "[she] notified Otsuka's RDLT that Verily [one of the electronic data capture ("EDC") systems] did not meet the

10

requirements of 21 C[.]F[.]R." (*Id.* ¶¶ 82-83.) But, Plaintiff fails to identify the precise provision of the regulation she is referring to and specify any details about such notification.[6]

Fourth, as to Otsuka's staffing levels, Plaintiff's SAC again fails to identify any rules, laws, or regulations, requiring a minimum number of employees to staff a data management team like Plaintiff's group. (*See generally* SAC.) In other words, as with Plaintiff's FAC, Plaintiff does not come forward with any authority to support that disagreements over a company's decision to hire internal employees or retain external contractors is a legitimate whistleblowing activity that could form the basis of a CEPA claim. Plaintiff's allegations that Otsuka altered its data collection program "without informing the sites," are not sufficient because, again, Plaintiff has not identified *what* that regulatory issue is. (*Id.* ¶ 102.) Relatedly, while Plaintiff contends that she identified that Otsuka was improperly engaged in "hardcoding" that violated ICH Guidelines (*id.* ¶¶ 131), the Court has outlined above that the ICH Guidelines do not constitute a statute, regulation, rule, or public policy triggering the CEPA's statutory protections.[7] For these reasons, Plaintiff has failed to sufficiently identify a statute, regulation, or public policy that closely relates to the complained-of conduct contained in her SAC.

Even assuming that the ICH Guidelines or regulations that Plaintiff provides satisfy the first element, Plaintiff fails to plausibly allege the third element—that Otsuka took a

---

[6] Nor does Plaintiff provide the provision of the regulation in her Opposition Brief to argue that Otsuka did not meet the technical requirements. (*See* Pl.'s Opp'n Br.)

[7] Contrary to what Plaintiff alleges, Defendant, in its moving brief, highlights that "FDA regulations allow sponsors to modify or delete data." (Def.'s Moving Br. 36-37 (citing 21 C.F.R. § 11.10(e).) Further, Plaintiff alleges in a conclusory fashion that since "sites were being permanently closed as the trial was ongoing . . .[,] Otsuka was not properly reporting adverse events reveal." (SAC ¶¶ 106-07.) Again, Plaintiff does not allege that Otsuka was not reporting adverse events after identifying them but instead seemingly complains about such procedures or protocols.

CEPA-cognizable adverse employment action against her. CEPA defines "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J. Stat. Ann. § 34:19-2(e). Retaliatory actions under CEPA must have an impact "on the employee's compensation or rank or be virtually equivalent to discharge." *Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 241-42 (3d Cir. 2016) (quoting *Caver v. City of Trenton*, 420 F.3d 243, 255 (3d Cir. 2005)). Accordingly, "not everything that makes an employee unhappy is an actionable adverse action." *Cokus v. Bristol Myers Squibb Co.*, 827 A.2d 1173, 1180 (N.J. Super. Ct. Law Div. 2002), *aff'd*, 827 A.2d 1098 (N.J. Super. Ct. App. Div. 2003) (quoting *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir. 1997)). Because CEPA's purpose is not to "assuage egos or settle internal disputes at the workplace," "[a]dverse employment actions do not qualify as retaliation under CEPA 'merely because they result in a bruised ego or injured pride on the part of the employee.'" *Beasley v. Passaic County*, 873 A.2d 673, 685 (N.J. Super. Ct. App. Div. 2005) (quoting *Klein v. Univ. of Med. & Dentistry*, 871 A.2d 681, 691-92 (N.J. Super. Ct. App. Div. 2005)). The definition of retaliatory action "speaks in terms of completed action . . . . [It] does not encompass action taken to effectuate the discharge, suspension or demotion" of an employee. *Keelan v. Bell Commc'ns Res.*, 674 A.2d 603, 607 (N.J. Super. Ct. App. Div. 1996) (internal quotation marks omitted). To this end, allegations of generalized harassment and retaliation are insufficient to constitute adverse employment action for a CEPA claim. *See Caver*, 420 F.3d at 257 n.12 (explaining that general "harassment is not unlawful retaliation" under CEPA); *Chun v. Sushi Maru Express Corp.*, No. 17-6411, 2018 WL 3158815, at *13 (D.N.J. June 28, 2018) (explaining that "[a]llegations of harassment alone are insufficient to constitute employer retaliation under CEPA").

Here, Plaintiff alleges that certain members of the RDLT grew "increasingly upset," she was "aggressively questioned[,] and her answers were dismissed," she was "berated . . . in meetings," and her "leadership team advised her that she was not a 'good fit'" for Otsuka and "became increasingly hostile." (SAC ¶¶ 123-25, 127, 136.) Plaintiff further alleges that Augustine and Profit were the individuals who retaliated against her by making "accusations" that she was "not capable," "slowly started isolating [her] from her peers," and failed to follow her suggestions. (*Id.* ¶¶ 158-59, 161.) Plaintiff also alleges that Augustine and Profit "made disparaging statements about [her] to . . . an Executive Coach." (*Id.* ¶ 163.)

At best, Plaintiff's allegation that RDLT grew "increasingly upset" is merely conclusory. *See Watts v. Twp. of W. Orange*, No. 15-3420, 2018 WL 944023, at *5 (N.J. Super. Ct. App. Div. Nov. 15, 2017) ("Workplace conflict alone does not constitute retaliation, as embarrassing and unpleasant as it may be."). Plaintiff's allegations that others told her she was "not capable" of performing her job and not a "good fit" are likewise insufficient. *Id.* at *6 ("[C]omplaints of 'insults and demeaning statements' do not rise to the level of retaliation."); *see also McCarthy v. Musclepharm Corp.*, No. 22-3412, 2023 WL 358561, at *14 (D.N.J. Jan. 23, 2023) (explaining that formal reprimands that result in a notation in an employee's personnel file could be sufficiently concrete for a CEPA claim, but harsh words that lack real consequences are not). As such, because Plaintiff also fails to plead a cognizable adverse employment action, Plaintiff's CEPA claim is dismissed.[8]

---

[8] Plaintiff also alleges that she was "constructively discharged," constituting an adverse action under CEPA. The Court, however, declines to address whether it was plausibly plead as an adverse action under CEPA. *See Nuness v. Simon & Schuster, Inc.*, 221 F. Supp. 3d 596, 604 (D.N.J. 2016) (granting a motion to dismiss on a constructive discharge claim where it dismissed the hostile work environment claim pursuant to Rule 12(b)(6)).

### IV. **CONCLUSION**

For the reasons stated above, Defendant's Motion to Dismiss is granted. Plaintiff's SAC is dismissed without prejudice. Plaintiff is granted one final opportunity to amend her complaint. Plaintiff has thirty (30) days to file a Third Amended Complaint, if she so chooses, consistent with this Memorandum Opinion. If Plaintiff fails to file a Third Amended Complaint, the dismissal will be with prejudice. An appropriate Order accompanies this Memorandum Opinion.

*/s/ Michael A. Shipp*
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE